NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued October 7, 2015
Decided November 19, 2015

**Before**

WILLIAMS J. BAUER, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 15-1185

| | |
|---|---|
| TONYA A. VANOVER, | Appeal from the United States District |
| *Plaintiff-Appellant*, | Court for the Northern District of Indiana, Fort Wayne Division. |
| *v.* | |
| | No. 1:13-cv-00312-RLM-RBC |
| CAROLYN W. COLVIN, | |
| Acting Commissioner of Social Security, | Robert L. Miller, Jr., |
| *Defendant-Appellee*. | *Judge*. |

**O R D E R**

Tonya Vanover applied for Disability Insurance Benefits and Supplemental Security Income, asserting that she is disabled by interstitial cystitis ("painful bladder syndrome"), bipolar disorder, and attention-deficit/hyperactivity disorder. The ALJ denied Vanover's application (a decision seconded by the district court) with the explanation that Vanover had exaggerated the extent of her symptoms and resulting limitations and that, therefore, she could work. We uphold that decision.

Vanover applied for benefits in January 2010, when she was 34 years old, and alleged an onset date in November 1998. Her date last insured was in June 2005. She

identified three impairments: interstitial cystitis, bipolar disorder, and attention-deficit/hyperactivity disorder. Before her onset date Vanover had received a high school diploma, had been certified as a nursing assistant, and had worked for two years as a packer at a pretzel plant. The Social Security Administration initially denied Vanover's application in May 2010, and did so again on reconsideration in July 2010. Her hearing before the ALJ was in March 2012.

Vanover has undergone multiple surgeries in her abdominal area. In 1996, her gallbladder was removed. After a complicated pregnancy her right ovary and appendix were removed in 1999. Two years later, after another difficult pregnancy, Vanover had a hysterectomy. Less than two years after that, she began suffering from chronic lower abdominal pain and reported episodes of rectal bleeding. To address these problems, in March 2003, doctors removed hemorrhoids, scar tissue, and three inches of Vanover's sigmoid colon.

Seven months later, in November 2003, Vanover began reporting increased pelvic pain, urinary frequency, and blood in her urine. Dr. Brian Stodgill, a urologist, examined Vanover's bladder with a scope and found several small hemorrhages on the bladder wall. He diagnosed Vanover with interstitial cystitis.[1]  Vanover's personal physician then prescribed medication, Elmiron, for her interstitial cystitis, but declined to grant Vanover's request for a 10 lb. lifting restriction at work. According to the doctor, the restriction "was not appropriate for interstitial cystitis alone." After this diagnosis Vanover continued to report pelvic and abdominal pain, diarrhea, and blood in her urine. Doctors performed multiple diagnostics tests, including CT scans, an endoscopy, and a colonoscopy, but none of those yielded significant findings.

In September 2006, Vanover complained about intense pain that she likened to feeling as if she were "splitting in two." Dr. Stodgill then reevaluated her and noted that doctors in Washington had discontinued the Elmiron prescription when she lived temporarily in Tacoma. He raised the possibility that "psychosocial factors" were "at play which contribute to her present illness." Dr. Stodgill recommended that Vanover restart her medication and that other possible sources of her pelvic pain be explored.

---

[1] "Interstitial cystitis is a chronic bladder condition that causes recurring bouts of pain and pressure in the bladder and pelvic area, often accompanied by an urgent and frequent need to urinate." *Diagnosing and treating interstitial cystitis*, HARVARD HEALTH PUBLICATIONS, http://www.health.harvard.edu/diseases-and-conditions/diagnosing-and-treating-interstitial-cystitis.

In 2008, Vanover underwent a second bladder exam. That exam again revealed hemorrhages on her bladder wall, as in 2003. The exam also uncovered detrusor instability (a condition that causes spontaneous bladder contractions and can lead to urinary incontinence, *see Overactive Bladder*, PATIENT, patient.info/doctor/overactive-bladder), linear cracking where the ureter and bladder join, and a Hunner's ulcer (a lesion on the bladder wall associated with interstitial cystitis, *see Interstitial Cystitis: Urgency and Frequency Syndrome*, AMERICAN FAMILY PHYSICIAN, http://www.aafp.org/afp/2001/1001/p1199.html).

Meanwhile, Vanover also had been receiving treatment for mental ailments. She reported starting treatment for depression in 2001 and experiencing increased symptoms in 2006 after the move to Washington. Vanover described her symptoms as irritability, depressed mood, low energy, difficulty concentrating, feelings of helplessness, and low self-esteem. She was prescribed anti-depressants to treat her symptoms.

In March 2010, shortly after Vanover had applied for benefits, she was examined by clinical psychologist Robert Walsh at the request of the state agency. Vanover told Dr. Walsh that she had been feeling depressed nearly every day and was having difficulty keeping up with household chores, although sometimes she did cook, clean, and do laundry. Dr. Walsh diagnosed Vanover with bipolar disorder. Based on Dr. Walsh's report and her own review of the entire record, another state-agency psychotherapist, Joelle Larsen, concluded Vanover has a severe condition but retained the mental capacity to perform simple, repetitive tasks in a competitive setting. In a separate report, Dr. Larsen noted that the record was inadequate to determine if Vanover had suffered from bipolar disorder before 2005.

Two months later Dr. Sayed Wahezi, a state-agency physician, examined Vanover. Vanover told Dr. Wahezi that she could sweep, shop, mop, walk stairs, vacuum, do dishes, and cook. Dr. Wahezi noted that Vanover's "allegations were discordant with the physical exam." Dr. Wahezi elaborated that he "did not appreciate any" functional deficits, cognitive deficits, or "psychological/psychiatric problems" and thus concluded that Vanover did not have "any functional limitations barring her from work-related activities."

Vanover continued to report abdominal and pelvic pain and difficulties with urination throughout 2011. She told urologist Gita Singh that she experienced pain six to seven times per month due to holding her urine. Vanover said that she typically urinated 15 or more times during the day and up to 10 times at night. Dr. Singh

recommended that Vanover restart her interstitial cystitis medication (apparently the drug had been discontinued) and cut back on drinking soda. Six months later, Vanover reported that her symptoms had improved somewhat, though blood still appeared in her urine and she awoke frequently at night to use the bathroom. Also in 2011, Vanover went to the emergency room several times for pain. After a CT scan, she was diagnosed with inflammatory bowel syndrome and possible colon spasms.

At a hearing before an ALJ in March 2012, Vanover testified about her physical symptoms. She said that her need to urinate frequently made holding a job difficult, and that the stress of working exacerbated her symptoms. Sometimes the pain from her bladder made her feel like she was "ripping in two." And though medication reduced the pain and frequency of urination, she couldn't always afford it and still experienced day-long debilitating pain twice a week even when she was taking the medication. Vanover also testified about her difficulty finding the right combination of medications to manage her bipolar disorder and depression. She described problems concentrating, managing stress, and controlling her temper, which in turn negatively impacted her relationship with her daughters and worsened her bladder and bowel problems.

Vanover testified that on an average day she would do dishes and pick up around the house, and on a good day she might cook supper. But some days she was in too much pain to do any chores, other days she was too depressed to leave her room. She reported leaving the house once a week to grocery shop with her husband, but could not stay long in the store. Her husband corroborated this account. He said that Vanover struggled "day to day with the pain" and constantly used the bathroom. When Vanover does housework, he testified, "she'll work for so long and then she has to stop" for a break "because of the pain."

A vocational expert was the only other witness. She said that Vanover could still work at several different jobs with the limitations identified by the ALJ: light work (standing or walking six hours per day); no more than superficial interaction with supervisors, coworkers, and the public; no detailed instructions; and no sudden or unpredictable workplace changes. The VE acknowledged, though, that Vanover would be unemployable if she must take hourly restrooms breaks or miss work entirely more than once or twice per month. After the hearing the ALJ sent interrogatories to a second VE, who concluded that an even wider array of jobs was available to someone with Vanover's limitations.

The ALJ applied the 5-step analysis for assessing disability, *see* 20 C.F.R. §§ 404.1520(a), 416.920(a), and at Step 1 determined that, except for a very brief period, Vanover had not engaged in substantial gainful activity since her alleged onset in November 1998. At Step 2 the ALJ identified Vanover's impairments as interstitial cystitis, bipolar disorder, depression, inflammatory/irritable bowel syndrome, obesity, and disorders of the spine, all of them severe. At Step 3 the ALJ concluded that these impairments, individually or in combination, do not satisfy a listing for presumptive disability. Vanover does not dispute these conclusions.

At Step 4 the ALJ rejected Vanover's account of disabling limitations on the ground that her testimony about the extent of her limitations was not credible. And Vanover's credibility did not get a boost from her husband's testimony, the ALJ added, because his "motivation to assist his wife in obtaining benefits lessens the reliability of his testimony."

The ALJ gave several reasons for disbelieving Vanover's reports of severe pain and frequent urination, among them that her daily activities (including reading, playing video games, watching television, sewing, and handling money) undermined her testimony of disabling pain. The ALJ also noted Vanover's report during a consultative exam that she could sweep, shop, mop, and vacuum. That Vanover could engage in all of these activities, the ALJ reasoned, showed that she was exaggerating her symptoms.

Finally, at Step 5 the ALJ found that jobs are available that Vanover can perform with her limitations.

The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner of Social Security. *See Scrogham v. Colvin*, 765 F.3d 685, 695 (7th Cir. 2014). We apply the same standard of review as the district court. *See* 42 U.S.C. § 405(g); *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013).

In this court Vanover makes only one argument: The ALJ overemphasized her daily activities in assessing her credibility. We review the ALJ's credibility assessment with special deference and will only overturn it if it is patently wrong. *See Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013); *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010).

We agree with Vanover that the ALJ did not provide a valid explanation for discrediting her based on the extent of her daily activities. Vanover was explicit that her daily activities depend on whether her symptoms are latent (allowing her to read, sew,

play video games, and watch television) or have flared up (extremely limiting her functioning). The ALJ erred in equating sporadic household chores, such as sweeping and mopping, and leisure activities, like watching television and playing video games, with full-time employment. Vanover has complete flexibility, of course, to accommodate her symptoms when completing chores or engaging in recreation, but she would not have that flexibility when working. *See Voigt v. Colvin*, 781 F.3d 871, 878–79 (7th Cir. 2015); *Garrison v. Colvin*, 759 F.3d 995, 1016 (7th Cir. 2014); *Beardsley v. Colvin*, 758 F.3d 834, 838 (7th Cir. 2014); *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012). Vanover testified that, even on good days, too much physical stress can aggravate her symptoms and that on bad days she does not even leave her room. Unless the ALJ thought that Vanover could schedule her two weekly bad days to coincide with days off from a job, it is difficult to understand how the ALJ reached the conclusion that Vanover's daily activities support a conclusion that she can work full-time.

But that error does not convince us that the ALJ's credibility assessment should be overturned. A credibility determination must take into account several factors, "including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations." *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009); *see* 20 C.F.R. § 404.1529(c); S.S.R. 96–7p. And, here, the ALJ based his credibility finding on several factors, the remainder of which Vanover does not challenge. *See O'Neal v. City of Chicago*, 588 F.3d 406, 409 (7th Cir. 2009) (stating that arguments not raised on appeal are waived). And even if she had attempted to challenge those findings on appeal, she can't because she failed to challenge them in the district court. *See Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012); *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004); *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000); *Ehrhart v. Sec'y of Health and Human Servs.*, 969 F.2d 534, 537 & n.4 (7th Cir. 1992). Because Vanover does not argue that anything else about the ALJ's reasoning is improper, we are satisfied that the credibility assessment is supported by substantial evidence.

AFFIRMED.